Long v Aerotek, Inc. (2022 NY Slip Op 00915)





Long v Aerotek, Inc.


2022 NY Slip Op 00915


Decided on February 10, 2022


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered:February 10, 2022

531638
[*1]Karen Long, Respondent,
v
Aerotek, Inc., et al., Appellants.

Calendar Date:October 14, 2021

Before:Garry, P.J., Egan Jr., Aarons, Reynolds Fitzgerald and Colangelo, JJ.

Bond, Schoeneck & King, PLLC, Albany (Stuart F. Klein of counsel), for appellants.
Finn Law Offices, Albany (Ryan M. Finn of counsel) and Husch Blackwell, LLP, Kansas City, Missouri (William E. Corum admitted pro hac vice), for respondent.



Egan Jr., J.
Appeal from an order of the Supreme Court (Lynch, J.), entered June 10, 2020 in Albany County, which partially denied defendants' motion for summary judgment dismissing the complaint.
Plaintiff, a single mother of Asian-American descent, was hired in August 2014 by defendant Aerotek, Inc. and worked in its office in the City of Albany, first as recruiter and then, upon her promotion in August 2015, as an account manager. Plaintiff was supervised by defendant Nicholas LaRocca from January to September 2015, and by defendant Michael Hawkins from January 2016 until she resigned on October 24, 2017.
Plaintiff commenced this action in June 2018, alleging, in relevant part, that defendants violated the Human Rights Law (see Executive Law § 290 et seq.) by discriminating against her based upon her gender, familial status and status as a victim of domestic violence, by creating a hostile work environment so extreme that it led to her constructive discharge, and by committing unlawful retaliation.[FN1] Plaintiff alleged in particular that LaRocca sexually harassed her while he was her supervisor by, among other things, subjecting her to unwanted sexual contact, propositioning her, threatening to hinder her career if she rebuffed his advances and making discriminatory comments to her and other women. She asserted that LaRocca continued to engage in impermissible conduct after she began working under Hawkins, including by continuing his sexist comments and actively undermining her standing with coworkers, and that Hawkins also discriminated against her by, among other things, removing her from a senior leadership team and placing her on a performance improvement plan (hereinafter PIP). Plaintiff further alleged that she was retaliated against because of her complaints about that treatment to defendant Suzanne Russo, one of Aerotek's human resources officials, and that the situation became so intolerable that she involuntarily resigned in October 2017. Following joinder of issue and discovery, defendants moved for summary judgment dismissing the complaint. Supreme Court granted the motion as to defendant Allegis Group, Inc. and denied the motion as to the remaining defendants. This appeal ensued.
We affirm. Plaintiff claimed the existence of a hostile work environment premised upon her gender and upon her status as both a victim of domestic violence and a single mother. A hostile work environment claim requires proof of a workplace "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [the plaintiff's] employment and create an abusive working environment" (Forrest v Jewish Guild for the Blind, 3 NY3d 295, 310 [2004] [internal quotation marks, citations and brackets omitted]; see Bilitch v New York City Health & Hosps. Corp., 194 AD3d 999, 1003 [2021]; Pawson v Ross, 137 AD3d 1536, 1537 [2016]). In assessing whether a plaintiff has made that showing, " a court must consider [*2]all the circumstances, including the frequency of the discriminatory conduct, its severity, whether it was physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interfered with the plaintiff's work performance" (Bilitch v New York City Health & Hosps. Corp., 194 AD3d at 1003; see Pawson v Ross, 137 AD3d at 1537; Minckler v United Parcel Serv., Inc., 132 AD3d 1186, 1187 [2015]). The workplace must also "be both subjectively and objectively hostile," meaning that "a plaintiff must not only perceive that the conditions of his or her employment were altered because of discriminatory conduct, but the conduct also must have created an environment that a reasonable person would find to be hostile or abusive" (Pawson v Ross, 137 AD3d at 1537; see Forrest v Jewish Guild for the Blind, 3 NY3d at 311).
At the outset, we reject defendants' contention that a sequence of events in early 2015 — in which LaRocca, plaintiff's supervisor for much of that year, forcibly kissed plaintiff, repeatedly propositioned her and made a veiled threat to impede her career after she rejected his advances — could not be considered in assessing plaintiff's hostile work environment claim because said conduct occurred beyond the statute of limitations for this action commenced in June 2018. Although plaintiff did not allege that LaRocca made sexual advances after the first part of 2015, she did describe a consistent pattern of sexist commentary and other behavior on his part that could be read as an effort to follow through on his threat to undermine her career if she rebuffed his sexual desires. By way of example, plaintiff claims that LaRocca routinely mocked her appearance, critiqued her makeup and clothing, suggested to her coworkers that they did not need to listen to her because it was her "time of the month" or because she was "emotional" and "bitchy," went out of his way to "showcase[]" her absence from work events after she complained to Russo about the way she and her female coworkers were treated in June 2016, and claimed that he was too busy to meet with her when she asked to discuss business issues in 2017.[FN2] Accordingly, although plaintiff concedes that a quid pro quo sexual harassment claim based upon LaRocca's sexual advances would be time-barred, that conduct remains "relevant to events during the [subsequent] period" where LaRocca "swift[ly] transition[ed] from entreaty to retribution," and it may be considered on what is indisputably a timely hostile work environment claim (Fitzgerald v Henderson, 251 F3d 345, 365 [2d Cir 2001], cert denied 536 US 922 [2002]; see National R.R. Passenger Corp. v Morgan, 536 US 101, 115-121 [2002]; Penniston v City of New York, 2017 WL 11507663, *7, 2017 US Dist LEXIS 228064, *21 [ED NY, Dec. 15, 2017, No. 13-CV-3572 (SLT/CLP)]).
Turning to the claim itself, plaintiff articulated how she complained to Russo in June 2016 about comments made by LaRocca and male coworkers toward her and [*3]other women in the office, behavior that, like the other allegations made against him by plaintiff, LaRocca did not deny in the affidavit that he proffered in support of defendants' summary judgment motion. Russo responded to that complaint by meeting separately with the women and the men in plaintiff's office to discuss the issue, but plaintiff described how it became common knowledge that she had made the initial complaint and how that knowledge led to her coworkers ostracizing her. Plaintiff went on to relate how she was removed from a senior leadership team in early 2017 by Hawkins, by then her supervisor, and how she suspected that Hawkins had done so because of her gender after learning that her male coworkers had been "very upset" by her inclusion and believed that it had occurred because, among other things, she was a woman. In his affidavit supporting defendants' summary judgment motion, Hawkins made minimal efforts to rebut plaintiff's allegations that discrimination played a role in that removal, stating only that he allowed the leadership team to become inactive in early 2017 and, strangely, that he told plaintiff "to focus on growing her own business" when she subsequently asked about the team instead of telling her that it no longer existed. Plaintiff also detailed how Hawkins wanted to "talk [to her] about [her] feelings" when they met in the year prior to her October 2017 resignation — particularly after she became embroiled in a child custody dispute and he placed her, but not others with performance issues, on a PIP in July 2017 — and how he hindered her career by deterring her from pursuing business opportunities and not inviting her to coworker get-togethers such as golf outings. Plaintiff also described a conversation with one of her former supervisors that gave her some insight into the behavior of Hawkins, who admitted to the former supervisor that he did not "know how to handle" women and that he wanted plaintiff transferred to a different department so that he could avoid supervising her. Hawkins similarly made no effort to rebut those allegations in his affidavit.
In short, plaintiff's descriptions of LaRocca's behavior indicate that she was subjected to conduct that was first "physically threatening or humiliating" and consistently and "unreasonably interfered with [her] work performance" by undermining her with her colleagues (Bilitch v New York City Health & Hosps. Corp., 194 AD3d at 1003; see Forrest v Jewish Guild for the Blind, 3 NY3d at 310). She further alleged how her efforts to address that behavior were ineffective and led to her isolation at work, while she was treated poorly by Hawkins because of her gender and status as a single mother. When all of this proof is viewed in the light most favorable to plaintiff, we are satisfied that "a reasonable person could find both that [plaintiff] subjectively perceived [the alleged] conduct as abusive and that [the alleged] conduct created an objectively hostile [*4]or abusive environment" so as to warrant a trial on her hostile work environment claim (McRedmond v Sutton Place Rest. & Bar, Inc., 95 AD3d 671, 672 [2012]; see Mykytyn v Hannaford Bros Co., 141 AD3d 1153, 1155-1156 [2016]; Kapchek v United Refining Co., 57 AD3d 1521, 1521-1522 [2008]).
Next, there is no dispute that plaintiff is a member of one or more protected classes who was qualified for the positions that she held, and she argues that she was subjected to "an adverse employment action . . . under circumstances giving rise to an inference of discrimination" (Reichman v City of New York, 179 AD3d 1115, 1116-1117 [2020], lv denied 36 NY3d 904 [2021]; accord Bilitch v New York City Health & Hospitals Corp., 194 AD3d at 1001). Plaintiff argues specifically that her October 2017 resignation constituted a constructive discharge, which would be an adverse employment action if Aerotek "deliberately made working conditions so intolerable that . . . she was forced into involuntary resignation" (Nelson v HSBC Bank USA, 41 AD3d 445, 447 [2007]; see Pennsylvania State Police v Suders, 542 US 129, 147-148 [2004]; Murphy v Department of Educ. of the City of N.Y., 155 AD3d 637, 640 [2017]). To understand that claim, additional detail is required regarding the events that led up to plaintiff's resignation. Hawkins placed plaintiff on a PIP from July 2017 to September 2017, then extended the PIP to October 2017, with the approval of Jerry DiBartolo, Aerotek's director of business operations. One of the requirements of the PIP was that plaintiff "[m]aintain a positive attitude in the office," which was connected to the prior gendered complaints about her being "too emotional." Plaintiff further felt unfairly singled out by the PIP because other employees, including a white man who was supervised by Hawkins, were not placed on a PIP in that period despite also underperforming on performance metrics. Plaintiff accordingly complained to Russo about the situation in August 2017, and plaintiff states that the main response to that complaint was to summon her to a meeting where Hawkins and DiBartolo, and Russo via speakerphone, demanded to know how she had been discriminated against and summarily dismissed her concerns. There was no follow up on the August 2017 complaint and, as the revised PIP wound to its conclusion in October 2017, plaintiff emailed Russo to state that she had been humiliated by the response to her August 2017 complaint, that she continued to feel targeted and that she wanted Aerotek to follow up and take remedial action to address the situation. Later that month, as plaintiff had received no adequate response and had become convinced both that a positive working environment was impossible and that Aerotek had only expressed interest in creating one because she had retained counsel, she resigned.
In our view, the broader account by plaintiff of a hostile work environment, Hawkins' behavior in placing plaintiff, but not a similarly situated [*5]man, on a PIP, and what plaintiff described as a wholly inadequate response by Russo to her August 2017 complaint about the situation reflect questions of fact as to whether plaintiff was subjected to a work environment so hostile that her only alternative was resignation and whether that hostility arose from a discriminatory motive (see LeGrand v Walmart Stores E., LP, 779 Fed Appx 779, 782 [2d Cir 2019]; Chertkova v Connecticut Gen. Life Ins. Co., 92 F3d 81, 89-90 [2d Cir 1996]; compare Pace v Ogden Servs. Corp., 257 AD2d 101, 104-105 [1999]). Defendants attempted to rebut the presumption of discrimination arising from those facts via the affidavit of Hawkins, who averred in conclusory fashion that the other employee he supervised was performing better than plaintiff at the time she was placed on a PIP and that the other employee was also placed on a PIP at some point. Hawkins, however, gave no detail as to how the other employee compared to plaintiff on the performance metrics, failed to deny that the other employee was also underperforming on those metrics in July 2017 and offered no explanation as to why he did not seek to place both on a PIP at that time.
Defendants further presented an affidavit from Russo in which she gave an account of her involvement that diverged widely from that of plaintiff, stating that plaintiff expressed no concerns regarding discrimination when she complained about the PIP in August 2017, that plaintiff seemed satisfied by the results of the August 2017 meeting and that plaintiff made no effort to follow up until October 2017. It is far from clear as to whether the limited information provided by defendants constituted clear proof of "legitimate, independent, and nondiscriminatory reasons" for the behavior that led to plaintiff's resignation that was sufficient to rebut the inference of discrimination and shift the burden back to plaintiff to show those reasons to be pretextual (Matter of Miller Brewing Co. v State Div. of Human Rights, 66 NY2d 937, 938 [1985]; accord Ferrante v American Lung Assn., 90 NY2d 623, 629 [1997]). Assuming that it was, however, plaintiff's account raised fact questions "as to whether [her] resignation was prompted by an intolerable work environment" resulting from discrimination (Kaptan v Danchig, 19 AD3d 456, 458 [2005]; see Sandiford v City of New York Dept. of Educ., 94 AD3d 593, 596 [2012]; cf. Bilitch v New York City Health & Hosps. Corp., 194 AD3d at 1001-1002).
Plaintiff also claimed that she suffered retaliation as the result of engaging in protected activity by complaining about discriminatory conduct in June 2016 and August 2017. The foregoing proof reflects that plaintiff faced "at least some 'new' or escalated conduct after the protected activities took place," and it is unclear whether the motivation for that conduct was retaliation or continued discrimination (Doe v New York City Police Dept., 190 AD3d 411, 413 [2021]; see O'Rourke v National Foreign Trade Council[*6], Inc., 176 AD3d 517, 518 [2019]). Accordingly, questions of fact exist as to whether defendants "took adverse employment action as a result of" that conduct, rendering summary judgment inappropriate on plaintiff's retaliation claim as well (Miller v City of Ithaca, 179 AD3d 1235, 1238 [2020]). Finally, viewing the proof in the light most favorable to plaintiff, the individual defendants were either responsible for the discriminatory conduct against plaintiff or aided and abetted in it, and summary judgment dismissing the claims against them is not warranted (see Executive Law § 296 [6]; Ananiadis v Mediterranean Gyros Prods., Inc., 151 AD3d 915, 919-920 [2017]).
Garry, P.J., and Aarons, J., concur.
Colangelo, J. (dissenting).
We respectfully dissent. In our view, there are no material issues of fact present that would preclude granting summary judgment to all defendants.
Initially, we disagree with the majority that Supreme Court did not err in denying defendants' motion for summary judgment with respect to plaintiff's claims of unlawful discrimination. "A plaintiff alleging discrimination in violation of [the Human Rights Law] must establish that (1) he or she is a member of a protected class, (2) he or she was qualified to hold the position, (3) he or she suffered an adverse employment action, and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination" (Reichman v City of New York, 179 AD3d 1115, 1116-1117 [2020], lv denied 36 NY3d 904 [2021]; see Bilitch v New York City Health & Hospitals Corp., 194 AD3d 999, 1001 [2021]). "To prevail on a summary judgment motion in an action alleging discrimination in violation of [the Human Rights Law], 'a defendant must demonstrate either the plaintiff's failure to establish every element of intentional discrimination, or, having offered legitimate, nondiscriminatory reasons for the challenged actions, the absence of a triable issue of fact as to whether the explanations were pretextual'" (Reichman v City of New York, 179 AD3d at 1117, quoting Langton v Warwick Val. Cent. Sch. Dist., 144 AD3d 867, 869 [2016]).
Defendants concede that the first two elements necessary to establish a claim of discrimination are not in dispute, as plaintiff is an Asian-American female who was purportedly qualified for the positions that she held at defendant Aerotek, Inc. However, defendants have demonstrated that plaintiff did not suffer any adverse employment action or, if she did, it did not occur under circumstances that gave rise to an inference of discrimination, and plaintiff failed to raise a triable issue of fact in this regard. As relevant here, plaintiff asserts that the following adverse employment actions were taken against her: she was removed from a senior leadership team; she was wrongfully placed on a performance improvement plan (hereinafter PIP) twice; she was relieved of various business opportunities; and she was effectively isolated from her peers[*7].
"'An adverse employment action requires a materially adverse change in the terms and conditions of employment'" (Reichman v City of New York, 179 AD3d at 1117, quoting Forrest v Jewish Guild for the Blind, 3 NY3d 295, 306 [2004]). "To be materially adverse, a change in working conditions must be 'more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation'" (Forrest v Jewish Guild for the Blind, 3 NY3d at 306, quoting Galabaya v New York City Bd. Of Educ., 202 F3d 636, 640 [2d Cir 2000]). Excessive work, denials of a request for leave with pay and a supervisor's general negative treatment are not deemed to be materially adverse changes in the terms, conditions or privileges of employment (see Fridia v Henderson, 2000 WL 1772779, *7, 2000 US Dist LEXIS 17295, *22 [SD NY, Nov. 30, 2000, No. 99-CV-10749 (BSJ)]). Nor does "[b]eing yelled at, receiving unfair criticism, [or] receiving unfavorable schedules or work assignments . . . rise to the level of adverse employment actions" (Kate v Beth Israel Med. Ctr., 2001 WL 11064, *14, 2001 US Dist LEXIS 29, *44 [SD NY, Jan. 4, 2001]).
Plaintiff put forth no evidence that defendant Michael Hawkins, her supervisor from September 2015 until she resigned in October 2017, or anyone else at Aerotek intentionally took any action against her, scheduled meetings or social events to exclude her, removed her from the now defunct senior leadership team for any reason other than what she was told — "to focus on [her] business" — or placed her on PIPs for any reason other than her work performance, which plaintiff admitted had "fallen back," and "to assist [plaintiff] with developing [her]self and in turn getting to [her] growth line and future career path." Moreover, plaintiff testified that the requirements of the first PIP were not unreasonable. Plaintiff failed to establish that she was placed on the second PIP for any reason other than, as expressed to her by Hawkins, she failed to complete the first PIP. Indeed, as Supreme Court noted, "[i]t is manifest that the [PIP] documents are written in objective terms directed to [p]laintiff's business improvement and are not couched in sex discrimination terminology."
Defendants contend, and the record demonstrates, that, at and after a meeting in August 2017 with defendant Suzanne Russo, an Aerotek human resources official, Hawkins and Jerry DiBartolo, a former supervisor and director of business operations overseeing Aerotek's City of Albany office, steps were taken to help plaintiff's performance get back on track. Plaintiff's proposed changes to the first PIP were agreed to by DiBartolo and were incorporated the following day. Moreover, [*8]DiBartolo approved a second PIP for plaintiff wherein he reduced the metrics used to evaluate plaintiff's performance by reducing the monthly "spread" that she was required to meet from $6,000 to $5,000. Despite plaintiff's testimony that Hawkins took steps to deprive her of business opportunities with one of her accounts, plaintiff acknowledged that she was told by Hawkins that "[Aerotek] wanted her to pursue other potentially new client opportunities that were purportedly better for the company" — which Supreme Court rightly characterized as a "plausible and non-sex discrimination business goal." Based on this evidence, we find, contrary to the majority's conclusion, that plaintiff failed to raise a triable issue of fact that she suffered an adverse employment action based upon her gender, familial status or status as a victim of domestic violence and would therefore grant defendants' motion dismissing her claims of discrimination as to all defendants.
We reach the same conclusion with respect to plaintiff's hostile work environment claim. "In order to establish the existence of a sexually hostile work environment, an individual plaintiff must show that his or her workplace was 'permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [his or her] employment and create an abusive working environment'" (Pawson v Ross, 137 AD3d 1536, 1547 [2016], quoting Forrest v Jewish Guild for the Blind, 3 NY3d at 310 [internal quotation marks and citations omitted]; see Reynolds v State of New York, 180 AD3d 1116, 1117-1118 [2020]). In making such a determination, all of the circumstances must be considered, including "the frequency of the discriminatory conduct; its severity; whether it [was] physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfere[d] with [the plaintiff's] work performance" (Minckler v United Parcel Serv., Inc., 132 AD3d 1186, 1187 [2015] [internal quotations marks and citations omitted]; see Bilitch v New York City Health & Hosps. Corp., 194 AD3d at 1003). "Moreover, the workplace must be both subjectively and objectively hostile. That is, a plaintiff must not only perceive that the conditions of his or her employment were altered because of discriminatory conduct, but the conduct must also 'have created an objectively hostile or abusive environment — one that a reasonable person would find to be so'" (Reynolds v State of New York, 180 AD3d at 1118, quoting Forrest v Jewish Guild for the Blind, 3 NY3d at 311; see Pawson v Ross, 137 AD3d at 1537).
Plaintiff testified that, in early 2015, within the first month of being supervised by defendant Nicholas LaRocca, he subjected her to sexual harassment while they were at a bar with some nonwork friends. Plaintiff alleged that LaRocca picked her up, pinned her against a wall, and "ma[de] out" with her "very brief[ly]." Later that night, LaRocca texted and called [*9]her asking her to take a taxi to his apartment, presumably to have sex, and, when she refused, he told her that "[she] wouldn't get ahead without his support and approval" (hereinafter the 2015 incident). Thereafter, and while LaRocca was still her supervisor, he expressed frustration towards her about her inability to stay at the office later, told women in the office that they look prettier with makeup, commented on their clothing, told them they should only wear heels and called women "bitches in front of other recruiters." Plaintiff testified that LaRocca told her that she looked "pretty dumpy" in the photo taken of her for the new employee hire book, she "can act like a bitch," that she was "too emotional" and that "it must be [her] time of the month." Plaintiff testified that LaRocca also told her peers and recruiters that they did not have to listen to her.
Plaintiff claims that Hawkins subjected her to a hostile work environment based on her gender by, among other things, asking her to talk about how her feelings were affecting her employment, taking business away from her, failing to invite her and other female employees to play golf with invited male account managers, and failing to include her in management meetings and social gatherings even though plaintiff expressed that she would like to be involved and needed advance notice. Plaintiff claims that she was told that she isolates herself from the team because she cannot attend happy hours or celebrations after work without notice. She also observed that her coworkers failed to engage in conversation with her and spread rumors about her, which she attributed to the treatment that she received from LaRocca and Hawkins.
The statute of limitations within which actions for discrimination under the Human Rights Law must be commenced is three years after the alleged unlawful discriminatory practice or act of discriminatory harassment (see CPLR 214 [2]; Mejia v T.N. 888 Eighth Ave., LLC Co., 169 AD3d 613, 613-614 [2019]). The continuing violations doctrine provides a narrow exception to the Human Rights Law limitations period and applies where "discriminatory conduct within the limitations period [is] sufficiently similar to the alleged conduct without the limitations period to justify the conclusion that both were part of a single discriminatory practice" (Walsh v Covenant House, 244 AD2d 214, 215 [1997]). Courts have found that allegations of sexual harassment, such as the 2015 incident, are "qualitatively different" than allegations of a hostile work environment, and these two different types of harassment are too dissimilar to be treated together as part of a single discriminatory practice (Fitzgerald v Henderson, 251 F3d 345, 364 [2001] [sexual harassment claim not saved by continuing violation theory where sexual advances by supervisor ceased but there was qualitatively different alleged harassment consisting of unwarranted criticisms, daily abuse, profane and physically intimidating [*10]tirade, and was not a continuation of the earlier advance]). There was no evidence presented of further sexual overtures by LaRocca at any time, much less during the limitations period. Accordingly, the continuing violations doctrine does not save the 2015 incident from being time-barred. Further, and contrary to the conclusion reached by the majority, the allegations of the incident are not relevant to plaintiff's claims.
Turning to the merits of the hostile work environment claim, we find that defendants established their prima facie entitlement to judgment as a matter of law dismissing this claim by demonstrating that the conduct and remarks that plaintiff complained of were not so severe or pervasive as to permeate the workplace and alter the conditions of plaintiff's employment (see Pawson v Ross, 137 AD3d at 1537; Forrest v Jewish Guild for the Blind, 3 NY3d at 310; Reynolds v State of New York, 180 AD3d at 1117-1118). The behavior attributed to Hawkins and the occasional derogatory comments that LaRocca made about other female coworkers, and the few comments that LaRocca did allegedly direct at plaintiff — occurring at unspecified times over the course of her employment — are not objectively considered to be more than "[i]solated remarks or occasional episodes of harassment [that do] not support a finding of a hostile or abusive work environment" (Clauberg v State of New York, 95 AD3d 1385, 1387 [2012] [internal quotation marks and citations omitted]; see Reynolds v State of New York, 180 AD3d at 1118; Pawson v Ross, 137 AD3d at 1537). To the extent that plaintiff's claims of a hostile work environment are based on comments and rumors of coworkers and their unwillingness to interact with her, her claims are vague, not sufficiently related to her membership in a protected class and insufficiently severe or pervasive to constitute an actionable hostile work environment. We therefore find that defendants are entitled to summary judgment dismissing plaintiff's hostile work environment claims against LaRocca and Hawkins.
We reach the same conclusion regarding plaintiff's claim against Russo of retaliation. "To state a prima facie case of retaliation under Executive Law § 296 (7), a plaintiff must allege that his or her employer took adverse employment action as a result of engaging in a protected activity" (Miller v City of Ithaca, 179 AD3d 1235, 1238 [2020]; see Forrest v Jewish Guild for the Blind, 3 NY3d at 312-313; Reichman v City of New York, 179 AD3d at 1119). "In the context of a case of unlawful retaliation, an adverse employment action is one which might have dissuaded a reasonable worker from making or supporting a charge of discrimination" Keceli v Yonkers Racing Corp., 155 AD3d 1014, 1016 [2017]). Notably, "'[t]he antiretaliation provision protects an individual not from all retaliation, but from retaliation that produced an injury or harm'" (Reichman v City of New York, 179 AD3d at 1119, quoting Burlington Northern & Sante [*11]Fe Ry. Co. v White, 548 US 53, 67 [2006]).
According to an email sent to Russo, plaintiff accused Russo of retaliating against her by "physically forc[ing] [her] into a conference room with [DiBartolo and Hawkins] with no notice to discuss [her complaints about being placed on a PIP]" and, after expressing to them how she felt that she was being discriminated against, Russo told her that "was silly," that Hawkins "is a wonderful person" and "[p]laintiff was being treated more fairly than other people." The record belies plaintiff's claim. In early August 2017, plaintiff emailed Russo and then spoke to her, complaining to her that she did not deserve to be on a PIP, despite acknowledging that her performance at work had "fallen back." According to Russo, during the conversation, plaintiff communicated that she was going through a custody case and was "stressed and exhausted." Russo then told plaintiff about Aerotek's employee assistance program and the potential of taking leave pursuant to the Family Medical Leave Act, followed by a suggestion that plaintiff meet with Hawkins and DiBartolo to discuss the PIP. According to Russo, plaintiff confirmed that she was willing to attend such a meeting. The following day, plaintiff attended a meeting with Hawkins and DiBartolo, with Russo appearing by phone. According to Russo, Hawkins and DiBartolo were supportive and expressed a willingness to help plaintiff get back on track; plaintiff seemed "poised" and she proposed changes to the PIP that DiBartolo accepted and agreed to incorporate the next day. According to the sworn affidavit of DiBartolo submitted in support of defendants' motion, "[t]he meeting was brief, and [plaintiff] did not appear upset or distressed during the meeting."
Given this evidence, we find that defendants met their burden on plaintiff's retaliation claim and plaintiff failed to raise a triable issue of fact that the meeting suggested by Russo was an adverse employment action that might dissuade a reasonable worker from making or supporting a charge of discrimination (see Keceli v Yonkers Racing Corp., 155 AD3d at 1016. To the contrary, the record reflects that plaintiff received support and accommodations by Aerotek staff, especially from Russo, throughout her employment. In addition to the PIP changes made by DiBartolo for plaintiff's benefit, Russo reacted without delay to solve any concerns that plaintiff brought to her attention.
Prior to June 2016, in spite of the requirement contained in Aerotek's employee handbook that harassment and discrimination must be immediately reported, plaintiff did not report the 2015 incident to the corporate office or communicate with anyone in the human resources department or management regarding the comments and conduct by Hawkins or LaRocca. Plaintiff testified that she did not report the 2015 incident because, as a single mother, she feared losing her job. In June 2016, plaintiff called Russo to discuss how she believed women [*12]are being treated in the office. Russo then traveled to the Albany office where plaintiff was working and separately met with groups of female and male employees. According to an email sent by plaintiff to Russo after these meetings, plaintiff was pleased with Russo's efforts and expressed her gratitude and the gratitude of her female coworkers, all of whom felt much better about coming to work after the visit. Accordingly, as plaintiff failed to raise a triable issue of fact with regard to her retaliation claim, we find that defendants are entitled to summary judgment dismissing this claim against Russo.
In our view, defendants also established their entitlement to summary judgment dismissing plaintiff's claim alleging that she was constructively discharged. "In order to maintain a cause of action for constructive discharge, a plaintiff must show that his or her employer deliberately made working conditions so intolerable that he or she was forced into involuntary resignation" (Nelson v HSBC Bank USA, 41 AD3d 445, 447 [2007]). In our view, the record is devoid of evidence that defendants subjected plaintiff to an adverse employment action or otherwise intentionally created an intolerable work environment in order to force plaintiff to resign.
Finally, we disagree with the majority that Supreme Court properly denied defendants' motion for summary judgment as to Aerotek. In order "[t]o recover against an employer for the discriminatory acts of its employee, the plaintiff must demonstrate that the employer became a party to such conduct by encouraging, condoning, or approving it" (Barnum v New York City Tr. Auth., 62 AD3d 736, 737-738 [2009] [internal quotations marks and citation omitted]; see Matter of Totem Taxi, Inc. v New York State Human Rights Appeal Bd., 65 NY2d 300, 305 [1985]). "Moreover, under Executive Law § 296, it is a defense to a claim of harassment arising from the conduct of a supervisory employee that the employer exercised reasonable care to prevent and correct promptly [the] discriminatory conduct
. . . and that the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to otherwise avoid harm" (Barnum v New York City Tr. Auth., 62 AD3d at 738 [internal quotation marks and citations omitted]). It is undisputed that plaintiff failed to report the 2015 incident to Aerotek human resources or management and did not report any form of discrimination or harassment to anyone at Aerotek until her email to Russo in June 2016, over a year after the 2015 incident and nearly nine months after plaintiff was no longer supervised by LaRocca. We would therefore also dismiss plaintiff's claim against Aerotek. In short, we would grant defendants' motion for summary judgment dismissing the complaint against all defendants.
Reynolds Fitzgerald, J., concurs.
ORDERED that the order is affirmed, with costs.



Footnotes

Footnote 1: Plaintiff also asserted a claim under the federal Family Medical Leave Act (see 29 USC § 2601 et seq.), resulting in the action's removal to federal court. Following dismissal of that claim, the state claim was remanded to Supreme Court in Albany County.

Footnote 2: Although LaRocca was no longer plaintiff's supervisor when she asked to meet with him in 2017, she testified that he was tasked with helping to manage her and other account managers during that period, that he was expected to "support them and mentor them," and that she was the only one who did not receive that support.